IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

CHARLES T. LANE,

                        Plaintiff,

  v.                                                       OPINION and ORDER

MAGELLAN HEALTH, INC.,                             22-cv-28-wmc

                        Defendant.

---

Plaintiff Charles Lane's former employer, defendant Magellan Health, Inc., fired him for failing to return to work after his statutory and contractual medical leave expired. In this suit, Lane claims that Magellan failed to accommodate his disability and wrongfully fired him in violation of the Americans with Disabilities Act, the Rehabilitation Act and the Family and Medical Leave Act. Magellan moves for summary judgment, contending that it was justified in firing Lane for failing to return to work despite receiving numerous, reasonable accommodations. (Dkt. #14.) The undisputed evidence at summary judgment establishes that Magellan provided reasonable accommodations to Lane, but that instead of returning to work, he applied for long-term disability. Accordingly, Magellan is entitled to summary judgment.

UNDISPUTED FACTS[1]

**A. Lane's Employment with Magellan Health**

In March 2007, plaintiff Charles Lane began working for defendant Magellan Health, Inc., a private managed healthcare company providing specialty healthcare services, including

---

[1] Unless otherwise noted, the following, undisputed facts are drawn directly from the parties'

mental health and substance abuse services, behavioral health, radiology services and pharmacy services. Lane held several positions at Magellan before being made the Senior Director of Recovery and Resiliency Services in 2015. In that role, Lane provided subject matter expertise on recovery and wellness issues for people with behavioral health needs, and he was responsible for training and educating other Magellan employees on those issues, as well as guiding senior staff in developing and implementing behavioral health products and services.

**B. Lane's Accommodation and Leave Requests**

Lane himself has been diagnosed with a bipolar type 2 disorder, which causes him high levels of stress and anxiety at times. In January 2020, Lane asked his manager if he could work 10-hour days, four days a week, with Fridays off, to help manage his bipolar disorder. His supervisor granted this request without requiring him to complete a formal ADA accommodation form.

In March 2020, Lane asked for additional work accommodations from Magellan. This time, his physician, Karen Swallen, M.D., completed Magellan's "workplace accommodation evaluation form" on behalf of Lane, which requested that Lane receiving the following accommodations: (1) "flexible work schedule when needed"; (2) "access to peer support"; (3) "flexible access to supervisor and other key business leaders/staff across functional areas to perform job duties"; (4) "discuss creation of a personal accommodation plan for projects/activities"; and (5) "discuss with supervisor ideas for organization wide strategy to provide clear guidance through new policies/procedures." (Dkt. #19-4.)

---

proposed findings of fact and responses.

In response, Kazia Steele, Magellan's human resources specialist, and Ashley Tomlin, Magellan's employee engagement consultant, met with Lane to discuss these requests. They told him that the evaluation form from Dr. Swallen did not identify specific accommodations, and that if he was requesting to continue his temporary schedule adjustment or to receive additional accommodations, he needed to provide more information. Lane explained that the four-day work week had been working well for him, that it resulted in less stress, and that he wanted it to continue. Lane also elaborated on some of Dr. Swallen's statements, explaining that: "peer support" included the ability for Lane to enlist the help of other Magellan and non-Magellan leaders with psychiatric disabilities; "flexible access" meant being able to contact and receive responses from colleagues outside of standard business hours, such as when he was working on a proposal after hours or on a weekend; and "personal accommodation plan for projects/activities" meant exploring how he could get more project management and administrative support for specific projects. In light of their discussion, Tomlin advised Lane to submit a revised accommodation evaluation form that identified what specific accommodations he needed to perform the essential functions of his job, and that Magellan would then consider whether these additional, specific accommodations should be granted. In the meantime, Magellan allowed Lane to continue working a four-day work week.

On May 27, 2020, Dr. Swallen submitted a second workplace accommodation evaluation form for Lane. On this second form, Dr. Swallen requested the following: (1) "flexible work schedule – 4 day work week"; (2) "flexible access to supervisor and other key business leaders/staff across functional areas to perform job duties"; (3) "development of a personal accommodation plan for complex projects and activities"; (4) "when traveling by air,

avoid early morning and late night departures that would interfere with medication routine"; and (5) "limit stress, be able to take breaks." (Dkt. #19-5.)

On July 6, 2020, Magellan notified Lane that it had approved the following accommodation requests: (1) to continue working a four-day work week; (2) have flexibility in making air travel plans that did not interfere with his medication routine; and (3) to continue having the flexibility in taking routine breaks as needed and as suggested by his physician, so long as the breaks did not "substantially impact [his] ability to perform [his] essential duties." (Dkt. #17-3.)

On July 14, 2020, Lane emailed Steele, the human resources specialist, that he had a question about intermittent leave. Steele responded that same day, asking what questions he had. (Dkt. #19-6.) However, Lane did not ask about leave again until September 15, 2020. On that day, he emailed Steele, stating that he had "been doing what I can to work," but that he needed "to initiate the process to put intermittent FMLA leave in place," preferably by October 1 or sooner, if possible. (*Id.*) Steele responded within a few minutes, advising Lane to contact Lincoln Financial, Magellan's leave administrator. Lane then told Steele that he was out of paid time off, and asked whether he would need to go on unpaid leave until he could apply for short-term disability. Steele again responded that Lane should contact Lincoln Financial, while advising that absences under the FMLA would be unpaid if he was out of paid time off.

That same day, September 15, Lane also emailed his manager, Cassie Leavitt, stating that he would start intermittent FMLA leave on September 23, 2020, and would be off work from September 23 to 25, but that he would provide a status report for all of his major projects before he went on leave. (Dkt. #19-7.) He also stated that he was going to ask his doctor for

4

the documentation necessary to apply for short-term disability benefits, and that if he was approved, he would "not be able to work on anything for Magellan after that date." (*Id.*) His manager sent a clarifying email, asking whether he planned on working at all while he was out, and he responded that once he was on short-term disability, he would "not be available for Magellan activities." (*Id.*)

Around this same time, Lane had asked his manager Leavitt to collaborate with him on an accommodation plan specific to a suicide awareness event on which he was already working. Leavitt responded that Lane could send her a proposal and she would review it. However, Lane never submitted anything for Leavitt to review, and eventually asked if he could step back from the event altogether because it was triggering for him as a suicide survivor. Leavitt approved his request to discontinue working on that project.

## C. Lane's Extended Medical Leave

As he had advised Leavitt, Lane began FMLA leave on or about September 23, 2020, initially intending to return to work on September 28, but then deciding that he could not do so. Lane emailed his manager, Leavitt, that due to personal circumstances and his doctor's medical advice, he had contacted Lincoln Financial to request continuous FMLA. A few days later, Lane's psychiatrist, Foster Ahn Hays, M.D., submitted an FMLA medical certification to Lincoln Financial stating that Lane could not perform any of his essential job functions and needed continuous leave through October 24, 2020. (Dkt. #20-2). Lincoln Financial approved Lane's continuous FMLA request.

Lane was scheduled to speak at a conference during the time he was on FMLA in October 2020. The day before the conference, a junior Magellan staff member contacted Lane

5

and told him that Magellan did not want him to participate in the conference while he was on leave. Lane was upset that a junior employee had relayed this message to him, and also because he viewed the conference as necessary peer support.

Although his approved continuous FMLA leave expired on October 24, 2020, Lane again chose not to return to work. However, because Lane had been approved for short-term disability benefits under Magellan's leave policies, he was provided 60% of his regular salary while on leave for medical reasons, for a maximum of 26 calendar weeks. Still, Lane did not apply for an extension of his FMLA leave before it expired on October 24, nor at any time before he exhausted the full 12 weeks of FMLA provided under Magellan's leave policies, but Magellan later approved his FMLA leave through December 14, 2020.

By December 8, Lane still had not informed Magellan whether he planned on returning to work. As a result, on December 9, Steele emailed Lane asking whether he knew if or when he might return to work. (Dkt. #20-5.) About a week later, Lane responded that he was frustrated with both Lincoln Financial and Magellan because he had not received timely, short-term disability payments and the process for obtaining the payments was unreasonable and stressful. (Dkt. #20-6.) Steele responded that she had forwarded Lane's concerns to Magellan's Benefits Team for review. Ultimately, on December 31, Lane emailed Leavitt and Steele that he was unable to return to work at that time.

On January 21, 2021, Lane emailed Steele asking for help getting Lincoln Financial to approve a continuation of his short-term disability, stating that he was now hoping to return to work in mid to late February, and inquiring about intermittent FMLA leave upon returning. The next day, Lane emailed Steele with questions about his short-term disability status and inquired whether he would have any FMLA time left when he returned to work. Steele

responded that Lane had 288 hours of FMLA remaining as of December 28, 2020, but this was incorrect, as Steele was relying on an outdated calculation in Lincoln Financial's database. As a result, on January 26, Lincoln Financial and Steele notified Lane that his FMLA leave had actually expired on December 14, 2020. Steele also notified Lane that because he had been on an unprotected leave of absence since December 14, his unscheduled absences put him at risk of termination under Magellan's leave policies. Steele further advised Lane that he might be eligible for additional consideration or job protection under the ADA, even attaching a workplace accommodation evaluation form for his psychiatrist to complete and return by February 10, 2021.

Lane responded to Steele's email by stating that he was puzzled, having thought that he had been on short-term disability, not FMLA. Steele responded that short-term disability benefits run concurrently with FMLA leave, so that the FMLA leave is compensated, but that he could not rely just on short-term disability. She also reiterated that "we are trying to engage in the ADA . . . in order to protect your absences from 12/14/2020 through the date in which your doctor clears you to return to work."

On February 2, 2021, Lane emailed Leavitt, asking Magellan to extend his FMLA status back to December 14, 2020, and further to extend that status for four months as an accommodation under the ADA. Steele, who was copied on Lane's email to Leavitt, responded to Lane the same day that he needed to engage with human resources regarding his request. She also explained that his doctor needed to complete and submit the workplace accommodation evaluation form she had previously sent him.

On February 16, Lane's psychiatrist, Dr. Hays, submitted a workplace accommodation evaluation form for Lane, requesting essentially the same accommodations for Lane that Dr.

7

Swallen had requested in June 2020, except that they be granted for the duration of Lane's employment. (Dkt. #20-12.) Dr. Hays also requested an extension of Lane's FMLA through May 1, 2021, but stated that Lane "may return to work sooner if appropriate." (*Id.*) The following week, Lane asked Steele whether she had any update on his request for a leave extension, to which Steele responded that she would inform him of Magellan's decision as soon as she received an update from Magellan's ADA Committee, the body that determines whether or how to accommodate employees based on information submitted in a workplace accommodation evaluation form and any other medical information. Lane also wrote that he intended to return to work on March 1, 2021. However, under Magellan's leave policies, Lane was required to submit a physician's release to return to work because he had been out on short-term disability for medical reasons. Lane failed to submit any physician's note, and a couple of days later, Lane notified Leavitt that he could not return to work on March 1 because he was waiting for a decision on his request for accommodations.

### D. Lane Applies for Long-term Disability Benefits

On March 23, 2021, Lane notified Leavitt and Steele that his six months of short-term disability benefits had expired, and he planned to submit a claim for long-term disability benefits. Between April 7 and 15, 2021, Lane also emailed Steele multiple times about delays in his short-term disability payments and about the status of his ADA request. Steele responded that she did not know about Lane's short-term disability benefits, but that his accommodation request assumed that he could return to work, which contradicted his previous communication that he was exploring long-term disability and needed to remain off work because of his medical condition. On April 21, Lane notified Steele that he had submitted his

long-term disability application to Lincoln Financial, and Steele responded by stating that if Lane's request for long-term disability benefits was approved, his employment may be terminated due to the length of time he had been away and because long-term disability benefits are only for those who cannot work. On May 7, Lane emailed Steele again about payment of his short-term disability benefits and not receiving a response to his request for accommodation.

**E. Magellan Terminates Lane's Employment**

On or about May 21, 2021, Lane was approved for long-term disability benefits, retroactive to March 23, 2021 when his short-term disability expired. At that time, Magellan's ADA review committee had not yet decided to provide additional accommodations to Lane. However, after Lane was approved for long-term disability, Magellan terminated Lane's employment pursuant to its leave of absence policies. Specifically, Magellan's policy is to terminate an employee's employment if that employee's short-term disability leave is exhausted and: (1) the employee does not request an accommodation; (2) the employee's condition is not covered by the ADA or cannot be accommodated; or (3) the employee transitions to long-term disability benefits because they are totally disabled.

OPINION

**A. Americans with Disabilities Act and Rehabilitation Act**

Under the ADA, employers are prohibited from discriminating "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a).[2] Lane contends that Magellan

---

[2] The relevant legal standards under the Rehabilitation Act and ADA are identical and the

violated the Americans with Disabilities Act by terminating him because of his disability and by failing to give him reasonable accommodations. These claims overlap substantially, and to prevail on either claim, Lane must show that: (1) he is disabled within meaning of the statute; (2) Magellan was aware of that disability; and (3) that he was "qualified" for the job in question. *Conners v. Wilkie*, 984 F.3d 1255, 1260–61 (7th Cir. 2021); *Whitaker v. Wisconsin Dep't of Health Servs.*, 849 F.3d 681, 684 (7th Cir. 2017). A failure-to-accommodate claim has the additional element that the employer failed to provide reasonable accommodation. *Conners*, 984 F.3d at 1261. A discrimination claim has the additional element that the plaintiff was discharged or subjected to another adverse action because of his disability. *Kurtzhals v. Cnty. of Dunn*, 969 F.3d 725, 728 (7th Cir. 2020).

There is no dispute that Lane's bipolar disorder qualifies as a disability under the ADA and Rehabilitation Act or that Magellan was aware of Lane's disability. However, Magellan contends that Lane was not qualified for his position because he could not return to work, that it provided reasonable accommodations for Lane, and that it terminated him because he failed to return to work, not because of his disability. Magellan is entitled to summary judgment if it shows that there are no genuine issues of material fact, that is, that no reasonable jury could find that Lane could satisfy the disputed elements of his claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The questions whether Lane was qualified and whether Magellan was providing reasonable accommodations are related. This is because the term "qualified" means two things

---

court's evaluation of Lane's claims under both statutes requires the same analysis. *See A.H. by Holzmueller v. Illinois High Sch. As"n*, 881 F.3d 587, 592 (7th Cir. 2018) For ease, the court will cite only to provisions of the ADA in this decision.

in the context of the ADA and Rehabilitation Act. First, the employee must have the basic qualifications required for the position, such as educational prerequisites, employment experience, skills or licenses. *Conners*, 984 F.3d at 1261. Magellan does not challenge Lane's qualifications in this respect. Second, the employee must be able to perform the essential functions of the job, without or without reasonable accommodation. *Id.*; 42 U.S.C. § 12111(8). Here, the parties agree that attendance was an essential function of Lane's job, and that he was not performing this function at the time he was fired. However, Lane asserts that he could have returned to work and performed all the essential functions of his job if Magellan had agreed to provide reasonable accommodations to him. Thus, as in many ADA cases, liability turns on the accommodation questions: (1) whether Magellan violate the ADA and Rehabilitation Act by failing to reasonably accommodate Lane's disability; and (2) whether Lane submitted evidence that a reasonable accommodation would have enabled him to perform the essential functions of his job.

Lane identifies three possible accommodations that he says Magellan failed to provide: (1) flexible access to business leaders; (2) a specific accommodation plan for the suicide awareness event; and (3) peer support. But Lane has failed to show that Magellan denied him these accommodations, or that he needed them to perform the essential functions of his job after returning to work. As Magellan's human resources personnel explained to Lane, the above accommodation requests were vague and non-specific. Even now, Lane has submitted *no* evidence showing that Magellan actually *denied* him these "accommodations." For example, Lane does not say that he was prohibited flexible access to business leaders, peer support or accommodation plans.

11

Moreover, the undisputed facts show that Magellan provided numerous accommodations for Lane in response to his and his doctor's requests: Lane was permitted to work four-day workweeks; he had flexibility in scheduling travel around his medication needs; he was directed to take breaks when needed; and he was permitted to cease working on the suicide awareness event. Thus, although Lane may not have gotten everything he wanted, that is not the standard under the ADA. *See Brunker v. Schwan's Home Service, Inc.*, 583 F.3d 1004, 1009 (7th Cir. 2009) (employer not required to provide employee's "ideal" accommodation). Rather, it is Lane's burden to show that Magellan's accommodations were not reasonable and that the additional accommodations he requested would have enabled him to perform the essential functions of his job. *See Stern v. St. Anthony's Health Ctr.,* 788 F.3d 276, 289 (7th Cir. 2015); *Mays v. Principi*, 301 F.3d 866, 871 (7th Cir. 2002). His evidence falls far short of satisfying that burden.

Lane argues vaguely in his brief that Magellan failed to engage with him regarding his accommodation requests. "[W]hen an employee asks for an accommodation because of a disability, the employer must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Kauffman v. Petersen Health Care VII, LLC*, 769 F.3d 958, 963 (7th Cir. 2014). But Lane does not explain what else Magellan should have done to engage with him, why the accommodations Magellan offered were unreasonable, or how any refusal to accommodate was connected to his inability to return to work. By failing to develop an argument on these issues, Lane has forfeited them. *See Cloutier v. GoJet Airlines, LLC*, 996 F.3d 426, 450 (7th Cir. 2021). And to the extent that Lane is contending that Magellan should have approved additional accommodations after his doctor resubmitted his accommodation request form in May 2020, this argument also fails. Despite

Magellan's request for additional and specific information regarding Lane's accommodation requests, Lane's doctor provided Magellan with no new information and did not explain why the accommodations provided already were unreasonable. So Magellan's failure to engage in further discussion did not violate the ADA. *See Rehling v. City of Chicago*, 207 F.3d 1009, 1016 (7th Cir. 2000) ("[Federal disability law] seeks to ensure that qualified individuals are accommodated in the workplace, not to punish employers who, despite their failure to engage in an interactive process, have made reasonable accommodations.").

Finally, Lane contends that Magellan failed to accommodate him by refusing to approve his request for additional medical leave in February 2021. As the Seventh Circuit has explained, however, "[t]he ADA is an antidiscrimination statute, not a medical-leave entitlement." *Severson v. Heartland Woodcraft, Inc.*, 872 F.3d 476, 479 (7th Cir. 2017). "A multi-month leave of absence is beyond the scope of a reasonable accommodation under the ADA," because the "ADA applies only to those who can do the job." *Id.* at 478–79, 481. Here, Lane was out on medical leave from September 2020 until his employment was terminated, in June 2021. His FMLA leave expired on December 14, 2020, but Magellan permitted him to stay employed and receive short-term disability benefits despite his leave being unprotected. It was not unreasonable for Magellan to terminate Lane's employment for his failing to return to work after a more than seven-month, medical leave.

Moreover, Magellan did *not* refuse to provide Lane with additional leave or terminate him because he requested additional temporary leave. Rather, the undisputed evidence shows that Magellan terminated Lane only after he applied for *and* was approved for long-term disability benefits, representing that he was completely unable to work as of March 2021. Because the "ADA applies only to those who can do the job," *Severson*, 872 F.3d at 481,

13

Magellan did not violate the ADA or Rehabilitation Act by terminating Lane after he and his doctor represented that he was completely disabled and could not work.

The bottom line is that Lane has not submitted evidence from which a reasonable jury could find that Magellan failed to provide a reasonable accommodation or that it terminated him because of his disability.

## B. FMLA Interference Claim

Lane also contends that Magellan interfered with his FMLA rights under 29 U.S.C. § 2615(a). However, Lane concedes that he ultimately received all 12 weeks of FMLA leave to which he was entitled. This dooms his claim. *See Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 597 (7th Cir. 2017) ("FMLA interference claim fails because he received the FMLA leave to which he was entitled."); *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 223 (7th Cir. 2015) (to prevail on an FMLA interference claim, an employee must show that "[his] employer denied [him] FMLA benefits to which he was entitled."). While Lane argues that he must only prove that Magellan "interfered with" his FMLA rights, citing *Ziccarelli v. Dart*, 35 F.4th 1079, 1090 (7th Cir. 2022), that case is inapposite, as it involved an employer who actively discouraged an employee from taking FMLA leave by threatening to discipline him for doing so and causing the employee to forgo taking FMLA leave.

Here, Magellan did not interfere with or discourage Lane from taking leave, but rather encouraged Lane to request leave and accommodations. Ultimately, Lane received all the FMLA leave to which he was entitled. Accordingly, Magellan is entitled to summary judgment on all of Lane's claims.

ORDER

IT IS ORDERED that defendant Magellan Health, Inc.'s motion for summary judgment (dkt. #14) is GRANTED. The clerk of court is further directed to enter judgment in favor of defendant and close this case.

Entered May 8, 2023.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge